# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

PAMELA D. PORTER,                     )
                                      )
      Plaintiff,               )
                                      )
vs.                                   )        No. 4:09-CV-00344-DGK
                                      )
SUN LIFE AND HEALTH                   )
INSURANCE COMPANY,                    )
                                      )
      Defendant.               )

## SUMMARY JUDGMENT ORDER

Plaintiff Pamela Porter brings this action pursuant to the Employee Retirement Income and Security Act ("ERISA") following Defendant Sun Life and Health Insurance Company's denial of her application for long-term disability benefits.

Now before the Court are the parties' cross motions for summary judgment. Finding that Porter is not covered by Sun Life's plan, Sun Life's motion (doc. 54) is GRANTED and Porter's motion (doc. 56) is DENIED.

### Summary Judgment Standard

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A party who moves for summary judgment bears the burden of showing that there is no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 256 (1986). When considering a motion for summary judgment, a court must scrutinize the evidence in the light most favorable to the nonmoving party, and the nonmoving

party "must be given the benefit of all reasonable inferences." *Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp.*, 950 F.2d 566, 569 (8th Cir. 1991) (citation omitted).

To establish a genuine issue of fact sufficient to warrant trial, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party must set forth specific facts showing there is a genuine issue for trial. *Anderson*, 477 U.S. at 248. But the nonmoving party "cannot create sham issues of fact in an effort to defeat summary judgment." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 402 (8th Cir. 1995) (citation omitted).

### Standard of Review in an ERISA case

Where the ERISA plan grants the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan, this Court reviews the denial of benefits under an abuse of discretion standard. *Groves v. Metro. Life Ins. Co.*, 438 F.3d 872, 874 (8th Cir. 2006) (citing *Ortlieb v. United HealthCare Choice Plans*, 387 F.3d 778, 781 (8th Cir. 2004)); *accord Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). The decision of the plan administrator should be reversed only if it is arbitrary and capricious. *Groves*, 438 F.3d at 874 (citing *Hebert v. SBC Pension Benefit Plan*, 354 F.3d 796, 799 (8th Cir. 2004); *cf. Schatz v. Mut. of Omaha Ins. Co.*, 220 F.3d 944, 946 n.4 (8th Cir. 2000) (holding that the level of review "for an 'abuse of discretion' or for being 'arbitrary and capricious' is a distinction without a difference," and that the terms are generally interchangeable). "When a plan administrator offers a reasonable explanation for its decision, supported by substantial evidence, it should not be disturbed." *Ratliff v. Jefferson Pilot Fin. Ins. Co.*, 489 F.3d 343, 348 (8th Cir. 2007). Substantial evidence is "more than a scintilla but less than a preponderance." *Wakkinen*

*v. UNUM Life Ins. Co. of Am.*, 531 F.3d 575, 583 (8th Cir. 2008) (citation omitted). The Court has previously ruled that because Sun Life is a successor corporation to an insurance company that had discretionary authority to make benefit decisions, Sun Life has discretionary authority to make benefit decisions, thus an arbitrary and capricious standard of review governs this case. Order dated (doc. 39) at 3-5.

The Court's review under this "deferential standard is limited 'to evidence that was before' the [administrator]." *Cash v. Wal-Mart Group Health Plan*, 107 F.3d 637, 641 (8th Cir. 1997) (quoting *Collins v. Cent. States S.E. & S.W. Areas Health & Welfare Fund*, 18 F.3d 556, 560 (8th Cir. 1994)); *accord Ravenscraft v. Hy-Vee Employee Ben. Plan & Trust*, 85 F.3d 398, 402 (8th Cir. 1996) ("In conducting judicial review under the deferential [abuse of discretion] standard, the reviewing court looks to the evidence before the Plan administrators when they denied the claim.") (citation omitted). "The purpose of this caveat is to 'ensure expeditious judicial review of ERISA benefit decisions and to keep district courts from becoming substitute plan administrators.'" *Cash*, 107 F.3d at 641-42 (quoting *Donatelli v. Home Ins. Co.*, 992 F.2d 763, 765 (8th Cir. 1993)). "A district court may admit additional evidence in an ERISA benefit-denial case, however, if the plaintiff shows good cause for the district court to do so." *Brown v. Seitz Foods, Inc., Disability Ben. Plan*, 140 F.3d 1198, 1200 (8th Cir. 1998) (citing *Ravenscraft*, 85 F.3d at 402).

Where the plan administrator both evaluates claims for benefits and pays benefits claims it approves, the administrator is operating under a conflict of interest that must be weighed as a factor in the Court's determination whether the denial of benefits was an abuse of discretion. *Metropolitan Life Ins. Co. v. Glenn*, 128 S.Ct. 2343, 2350 (2008). The conflict of interest is weighed as one of several factors and "serves 'as a tiebreaker when the other factors are closely

balanced' and is 'more important . . . where circumstances suggest a higher likelihood that it affected the benefits decision' and 'less important . . . where the administrator has taken active steps to reduce potential bias and to promote accuracy.'" *Hackett v. Standard Ins. Co.*, 559 F.3d 825, 830 (8th Cir. 2009) (quoting *Glenn*, 128 S.Ct. at 2351).

## Factual Background

The Record in this case is as follows.[1] Plaintiff Pamela Porter seeks long-term disability ("LTD") benefits under an employee welfare benefit plan ("the Plan") maintained by Los Padres Bank for its employees, with benefits underwritten by Sun Life pursuant to the terms of Group Certificate No. 246-6515-00 ("the Certificate"). The Plan is governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.*, ("ERISA").

**A.    Relevant Certificate provisions**

The Certificate defines "Employer" as "The Employer shown in the Insurance Schedule." The Employer listed in the Insurance Schedule is Los Padres Bank. In the request for coverage form submitted by Los Padres Bank in October 2001, the only entities listed as "subsidiaries or other locations, affiliates, to be covered" are Harrington Bank and Harrington Wealth Management.

The Certificate defines disability as follows:

> Total Disability must be caused by Sickness or Injury and must commence while you are insured under the policy. You will be considered Totally Disabled if you are unable to perform all the material and substantial duties of your Regular Occupation.

It defines "Regular Occupation" as, "The occupation you are performing when your Period of Disability commences. This refers to your occupation as it is typically performed rather than the duties required by a specific employer or at a specific location." It provides that the "Monthly

---

[1] Although the Court's decision is based solely on Porter's eligibility under the Certificate, the Court has provided a substantial summary of the record to orient the reader to this dispute.

Benefit will be an amount equal to the lesser of: (1) 662/3% of your Basic Monthly Earnings; or (2) the maximum monthly benefit of $10,000," and it defines "Basic Monthly Earnings" as "your gross monthly compensation from your Employer including the gross monthly rate of commissions during the calendar year(s) period prior to your Period of Disability." The Certificate also states:

> We will pay you the Monthly Benefit shown in the INSURANCE SCHEDULE for a Period of Disability, subject to all of the terms of the policy, if you satisfy the following conditions:
>
> 1. You must send Proof to us that you have become Disabled;
> 2. **You must be insured under the policy at the time your Disability commences;**
> 3. You must be under the regular and Continuing Care of a Physician for the Sickness or Injury causing your Disability; and
> 4. You must have completed the Elimination Period shown in the INSURANCE SCHEDULE.

(Emphasis added.) It also provides that,

> We will continue to pay you the Monthly Benefit during a Period of Disability, subject to all the terms of the policy, until the earliest of:
>
> 1. The date you cease to be Disabled;
> 2. The date you reach the Maximum Benefit Duration shown in the INSURANCE SCHEDULE;
> 3. The date you fail to give us required Proof that you are still Disabled;
> 4. The date you refuse to allow an examination we request;
> 5. The date you are no longer under the regular and Continuing Care of a Physician;
> 6. The date you die; or
> 7. The date benefits terminate in accordance with the REHABILITATION part of this Certificate.

The Certificate defines continuing care as, "You visit a Physician whose medical specialty is the most appropriate specialty to evaluate, manage or treat your Sickness or Injury and you receive care and treatment as frequently as is medically necessary."

The Certificate also grants Sun Life express discretionary authority to approve or deny claims.[2]

**B.      Approval of Plaintiff's initial claim for disability benefits.**

Porter, currently age 52, began her employment with Los Padres Mortgage Company, LLC ("LPMC") in 2002.  As of the date of Porter's injury, February 1, 2004, LPMC was owned 51% by Los Padres Bank, and 49% by Resource Marketing Group, Inc., the holding company/owner of RE/MAX Achievers and RE/MAX Commercial Investment.    LPMC employed Porter as a vice president and business development officer at a monthly salary of $4,500, and she also received commissions.  She reported to Los Padres Bank and adhered to the bank's hiring policies and practices.  Her job was a light duty occupation.  It required frequent sitting, talking, keyboard use, hearing and near acuity; walking or standing to a significant degree; and climbing, balancing, handling, fingering, depth perception, color vision, field of vision and accommodation.  Travel was also required.

---

[2] It states:

**Claims Fiduciary** - GE Group Life Assurance Company is a fiduciary, as that term is used in ERISA and the regulations which interpret ERISA, with respect to insurance policies under which you and, if applicable, your dependents are insured. In this capacity, we are charged with the obligation, and possess discretionary authority to make claim eligibility and other administrative determinations regarding those policies, and to interpret the meaning of their terms and language. GE Group Assurance Company, as Claims Fiduciary, shall have the sole and exclusive discretion and authority to carry out all actions involving claims procedures explained in the Policy. The Claims Fiduciary shall have the sole and exclusive discretion and power to grant and/or deny any and all claims for benefits, and construe any and all issues relating to eligibility for benefits. All findings, decisions, and/or determinations of any type made by the Claims Fiduciary shall not be disturbed unless the Claims Fiduciary has acted in an arbitrary and capricious manner. Subject to the requirements of law, the Claims Fiduciary has acted in an arbitrary and/or capricious manner. Subject to the requirements of law, the Claims Fiduciary shall be the sole judge of the standard of proof required in any claims for benefits and/or in any question of eligibility for benefits. All decisions of the Claims Fiduciary shall be final and binding on all parties. Whenever a decision on a claim is involved, the Claims Fiduciary shall be final and binding on all parties. Whenever a decision on a claim is involved, the Claims Fiduciary is given broad discretionary powers, and the Claims Fiduciary shall exercise said powers in a uniform and nondiscriminatory manner in accordance with the Plan's terms. Our authority is limited to such insurance policies and we are not a fiduciary of any other aspect of the Plan, insured or otherwise. We are not the Plan Administrator (as that term is understood under ERISA) and we are not responsible for any assert or property which belongs to the Plan.

Porter fractured the fifth metatarsal bone in her right foot on February 1, 2004, after missing a step at a friend's house during a Superbowl party. On February 3, 2004, she saw Dr. Marcia Sistek for an evaluation of her right foot. X-rays revealed a complete oblique simple fracture which was angulated of the fifth metatarsal shaft. A podiatric exam showed edema of the right foot, with ecchymosis plantarly in the arch area. An orthopedic examination revealed splinting of the foot with pain on palpation along the shaft of the fifth metatarsal, with definite swelling noted. X-rays taken on February 5 indicated angulation of the fifth metatarsal shaft in a dorsal plantar direction as well as a medial shift in the shaft of the fifth metatarsal distal portion.

Dr. Larry Zonis, DPM, recommended an open reduction of the fracture to straighten out the angulation and to insert a couple of screws to help stabilize the fracture. Dr. Zonis provided Porter with a Cam Walker and advised her to remain as non-weight bearing as possible and to use crutches. On February 6 he performed a complete oblique simple fracture on the fifth metatarsal shaft of her right foot, with bayoneting, and an open reduction and internal fixation of the fracture of the fifth metatarsal of the right foot with two 0.054 K-wires. During the procedure, he observed that there was marked bleeding in the soft tissue area as a result of the fracture, along with a hematoma formation within the fracture site. He noted, "This was keeping the structure distracted along with contracture of the tissue, which may cause it to bayonet approximately." He attempted to internally fixate the fracture with cannulated bone screws, but noted the bone was quite friable, and that there were small pieces of bones not visible on the x-rays which appeared to be fragmenting off the fractured edges. Dr. Zonis ordered Porter to remain non-weight bearing on the right side until further notice.

During a subsequent examination on February 13, 2004, Dr. Zonis wrote "Examination reveals: incision to be clean, dry and intact. No evidence of infection. Normal postop swelling

present.  Ecchymosis noted on the distal dorsal bases of toes. There is good range of motion without crepitus of all the MPJs."  During a follow-up telephone conversation between Dr. Zonis and Porter, he reiterated that she could not put weight on her heel.

During an exam on February 23 Dr. Zonis noted that there was "no evidence of bone callus or healing seen on the x-ray."  He ordered Porter to remain in the Cam Walker and to remain non-weight bearing.

On February 24, 2004 Porter fell while maneuvering in the restroom at work.  The next day Dr. Zonis evaluated her for a "re-injury to her right foot in the third postoperative period." He wrote that "Pam must keep her right foot elevated and must not put any pressure on this foot. Additionally, Pam was advised not to drive."  He also "recommended Pam not return to work during this early postoperative period time frame.  A secondary review will be conducted on or about April 16, 2004 to determine the status of her recovery."  He also noted that "there is definite pain at the plantolateral aspect of the right foot."  His treatment plan stated that,

> Currently I want Ms. Porter to remain non-weight bearing on her foot. I feel that it would be detrimental for her to attempt to drive a car or to go out anywhere where she could jeopardize herself and cause more problems to her foot. I would say that she actually needs to just stay out of work for the time being until she is able to motivate in a more fluid manner, therefore work is prohibitive at this time.

On March 22, 2004 Dr Zonis re-evaluated Porter.  He noted that the incision was healing, but was slightly weakened.  He also noted that there was apparently some drainage in the past, and that "there is still some post traumatic swelling with the discomfort at the areas where the K-wires are noted to be present within the 5th metatarsal."  He ordered her to remain non-weight bearing.

Porter stopped working due to the disabling effects of her fractured foot and the resulting complications. In April 2004, she applied for long term disability benefits with Sun Life, starting February 1, 2004. Sun Life started payment benefits as of May 1, 2004. Sun Life calculated Porter's monthly pay to be $5,683.33. This calculation did not include commissions Porter received in the year she became disabled. Porter calculates her monthly pay to be $6,183, and her "Schedule Amount" to be $4,121.81.

Porter next saw Dr. Zonis on April 21, 2004, and in the interim she continued to remain non-weight bearing. Dr. Zonis noted she continued to use a Cam Walker and a wheel chair, and that she continued to have pain at the proximal aspect of the fifth metatarsal, as well as plantar to the fifth metatarsal.

At the next examination, on April 27, Dr Zonis wrote,

> S: Patient returns for continued examination. Still having some pain at the proximal aspect 5th metatarsal base as well as plantar to the 5th metatarsal.
>
> O: Examination reveals: no significant or additional changes in appearance of foot. Wound is healed. Edema is diminished tremendously.
>
> A: Clinically improving although still having some pain, probably the result of the Kwires.
>
> P: Treatment plan: I x-rayed her at this date. The x-rays revealed the K-wires to be intact and in position. No change of the fracture site is noted. No motion of the fracture site has been seen although there is some distraction noted on x-ray and angulation. Will try to get her scheduled for removal of K-wires to help with her pain and also to get her walking again. She has definitely osteoporosis of the fracture area.

Dr. Zonis also prescribed a bone stimulator. During a May 25, 2004 visit, he noted, "She has not put any weight on her foot up to this point and she discontinued utilizing the bone stimulator this past week because of postop pain." During a June 3, 2004 follow-up visit he remarked, "Status

post ORIF and removal of internal fixation approximately two weeks, healing as expected with more pain than I had hoped."

On July 9, 2004, Dr. Zonis examined Porter and noted that she was still having pain plantarly beneath the base of the 5th metatarsal. After taking additional x-rays, he found that she had "marked diffuse osteoporosis throughout the entire foot." He believed this needed to be checked for reflex dystrophy. Porter also noted that her foot would feel cold and turn purple whenever she hung it down for an extended period of time. During an August 6, 2004, office visit Dr. Zonis wrote, ". . . She notes that her ankle is starting to swell and she is getting some pain, more than she had before the fracture . . ."

Porter applied for social security disability income benefits, and her application was denied on August 4, 2005. The Social Security Administration opined that she had impairments which restricted her activities but, "the medical evidence shows that you are able to return to your past employment as a loan officer/closer, as you described this work."

Dr. John Sand discussed Porter's condition at length in an August 13, 2004 letter. He noted he instructed Porter,

> to elevate [her right foot] for several weeks without weight bearing. The swelling did decrease and during this time she was taking p.r.n. Percocet and Advil with some benefit. However, she had continued pain [and] an inability to put any weight on it, and evidently follow-up revealed poor healing. In fact, she was essentially bed and chair bound until May when she had the pins removed surgically.

Since then, "she still has difficulty with weightbearing. She was placed on an electrical stimulator without significant benefit. Repeat x-rays have evidently shown poor healing." Dr. Sand stated the "pain radiating up to [Porter's] ankle. She has virtually no pain when she has no weightbearing, but the pain comes back immediately at that time. . . . Social history reveals the

patient to be presently disabled and living with her boyfriend of 14 years." He noted her "right foot was slightly atrophic and slightly erythemalous." He also observed that "the motor examination revealed atrophy as noted above," that "there may have been mild weakness of right foot eversion," and that her "gait was antalgic but otherwise unable to be tested." Dr. Sand also stated it was possible that she had nerve injury and aseptic necrosis of the right 5th metatarsal head.

On September 16, 2004, Dr. Sheldon Fleishman ordered an MRI of Porter's foot. The clinical statement reported, "osseous structures demonstrate irregularity within the mid shaft of the fifth metatarsal. There is slight displacement noted and this is the site of the patient's prior fracture with nonunion healing." It also stated that "there are other mild diffuse degenerative changes of the osseous structures noted." The MRI report noted fluid surrounding the flexor digitorum longus and the flexor hallices longus tendons. It ultimately concluded that there was a chronic fracture involving the fifth metatarsal with slight displacement and at least a partial nonunion appearance, that the findings were consistent with tenosynovitis of the flexor hallices longus and the flexor digitorum longus tendons, and that other mild degenerative changes of the osseous structures were noted. After an October 6, 2004 visit Dr. Fleischman noted that Porter "continues to relate symptoms associated with probable tenosynovitis and myositis of the muscular structures right lower extremity, that are probably related associated [sic] with guarding due to the fracture fifth metatarsal right foot."

On October 18, 2004, Dr. Zonis completed an "Attending Physician Statement" in which he made the following findings regarding Porter's physical capabilities and limitations:

"1. Can do occasional lifting of 1-5 pounds

2. Can do occasional carrying of 1-5 pounds

3. Can perform occasional standing, walking, bending, squatting, stooping and kneeling

4. She is unable to stand; therefore restricted as to her job responsibilities."

On October 22, 2004, Los Padres Bank Assistant Vice President and Human Resources Supervisor Nicole R. Painter sent a letter to Ellen Kiely at GE Financial to

> inform GE Financial that Pam Porter was Vice President and Business Development Officer for Los Padres Mortgage Company, LLC. She supervised a staff of about ten employees. Some of these employees operated in different offices. On frequent occasions, Ms. Porter was required to drive to these locations and was also required to drive when visiting clients.

It was sent on Los Padres Bank letterhead and did not explicitly state that Los Padres Mortage Company, LLC, was a separate and distinct corporate entity from Los Padres Bank co-owned by another company.

On October 26 Maureen Thiel, a registered nurse employed by Sun Life, reviewed Porter's medical file. After reviewing the medical information provided by Porter's doctors, and job information provided by her employer, Ms. Thiel noted that the job requirements of travel and walking made the "restrictions of minimal walking reasonable at this time."

Porter saw Dr. Fleishman again on December 17, 2004. At that time, the doctor noted that "no bone healing appears to be evident," and that the "patient relates no significant decrease in symptomatology, however, no significant pain was present on palpation of the fracture." He advised that she continue utilizing a cam walker. He also noted that her "radiographs do indicate considerable osteoporosis, therefore, internal fixation and bone graft may be difficult to achieve union of the fracture due to the osteoporosis."

Starting in October of 2004 and continuing through January 27, 2005, Porter saw a physical therapist on the recommendation of Dr. Fleischman. At that time, she rated her pain at a

3-4 out of 10 while at rest, and up to a 6 out of 10 while ambulating. The treatment notes state Porter had not made progress in reducing her pain.

On February 18, 2005, Dr. Fleischman completed an "Attending Physician's Supplemental Statement" in which he indicated that Porter was limited to a half hour of total time on her feet during the day.

On September 20, 2005, Porter was evaluated by Dr. Greg Horton, an orthopedic surgeon. Dr. Horton noted her continuing neurogenic pain and observed she "has a challenging set of problems." He suggested the possibility of performing surgery to attempt to correct her problems. On September 21, 2005, he completed an "Attending Physician Statement" which indicated Porter could occasionally lift and carry 1 to 5 pounds and occasionally sit, stand, walk, bend, squat, stoop, kneel, work outside and work with others.

On September 22, 2005, Concentra completed a Labor Market Survey Report which identified ten potential employment opportunities for Porter, each with a different national employer, but concluded, "All of the positions exceed the claimant's physical abilities."

On October 10, 2005, three radiographs were taken of Porter's right foot. The interpretation stated that there "is diffuse osteopenia of the bony structures. There is a residual deformity from old, healed fracture involving the mid shaft of the fifth metatarsal." The impression also noted "degenerative osteoarthritic changes of the right foot."

On October 26, 2005, Dr. Horton performed a right ankle arthroscopy with partial synovectomy, a right lateral ankle ligamentous reconstruction utilizing a modified Brostrum type procedure, and a 2nd and 3rd tarsal-metatarsal arthrodesis with harvest of calcaneal bone graft. In his report of the operation Dr. Horton noted "moderate inflammatory synovium along the anterior lateral corner of the ankle." The postoperative diagnosis stated "right ankle instability

with late effects of sprain of the ankle, traumatic arthropathy involving the tarsal-metatarsal joint complex, mainly the 2nd and 3rd tarsal-metatarsal joint," which was unchanged from the preoperative diagnosis.

Dr. Horton saw Porter for a follow-up of her foot reconstruction surgery on January 17, 2006. He noted she was experiencing activity related pain and swelling, and he referred her to another physical therapist. The referral form dated April 2, 2006 lists "Pain: constant, variable; 3- 7.5/10," and hypersensitivity as her chief complaints. Aggravating factors included putting weight on the foot/ankle, driving, and using stairs. It was noted that the pain and discomfort from her ankle caused regular sleep disturbances. Porter was referred to physical therapy due to her poor recovery after her surgery, and because other treatments had been no help.

On April 13, 2006, Dr. Horton completed an "Attending Physician's Supplemental Statement," in which he reported Porter had a work capability of "sedentary only, otherwise no work." Dr. Horton's statement also described Porter's functional limitations. He indicated that she could never do any amount of lifting or carrying; she was unrestricted in sitting; but she had no capacity for standing, walking, bending, squatting, stooping or kneeling.

Porter was in physical therapy consistently following her surgery. During her visit to The University of Kansas Medical Center Sports Medicine Institute on April 25, 2006, she reported being in "more pain consistently post-PT," and that a prominent bump on her ankle was causing problems.

On May 16, 2006, Porter met again with Dr. Horton. He noted that she had residual discomfort in a number of areas, and had pain both laterally and plantarly, which Horton felt was mainly soft tissue in nature. He was also "certain" that she would be left with residual

symptoms.  Dr. Horton recommended situational use of her brace and asked that she return in three months.

On October 26, 2006, Porter went in for a reevaluation with Dr. Horton.  During this visit he noted that she was having pain in the arch of her foot, and pain that ran up her leg.  He also noted she was experiencing difficulty with prolonged standing and walking.  Dr. Horton prescribed Neurotonin to try to help with the pain.

Dr. Horton next saw Porter on February 19, 2007.  He confirmed that she was able to work in a sedentary work setting, but was limited to 1-2 hours of total time on her feet, standing, walking, bending, squatting and stooping.  He also indicated that she had not yet reached medical improvement, though he was unsure when he would expect a fundamental change.  Dr. Horton also indicated that she was not a suitable candidate for further rehabilitation services.

**C.**     **Sun Life terminates Porter's claim for disability benefits.**

On July 27, 2007, Sun Life forwarded its file to independent medical consultant Thomas K. Hicks, M.D., M.P.H., requesting clarification of Plaintiff's restrictions and limitations.  Dr. Hicks attempted to discuss Porter's condition with her treating physician, Dr. Horton, who was not available.  Absent a call back from Dr. Horton, Dr. Hicks suggested an independent medical examination as well as surveillance to objectively observe her level of activity.  Dr. Hicks final report was less than one page long.  He noted that Porter was having pain in her arch running up her leg, and that she was having difficulty with prolonged driving and prolonged standing and walking.

Sun Life subsequently arranged for video surveillance of Porter to be taken from September 24 through 26, 2007.  The footage shows Porter moving intermittingly for 3-4 hours a day, driving to a Wal-Mart, an Apple Market grocery store, standing, fueling her vehicle and

walking up and down a slight slope near her residence while conversing with her neighbor. Porter is also seen driving to and shopping in an office supply store, and retrieving mail from a mailbox. The video does not show Porter having any significant difficulties ambulating. She walks without assistive devices, without demonstrating any pain behavior, and with more or less fluid movements.

Sun Life then had Dr. Hicks review the video, and he wrote:

> I reviewed the videotape of the claimant's activity on the following dates: September 24, 2007, September 25, 2007 and September 26, 2007. The videotape shows the claimant to be active in a number of activities including driving, pumping gas, shopping and running other errands. She was observed to enter and exit her vehicle without any signs of impairment. She walks on level as well as unlevel surfaces (e.g. grassy hill) without any signs of impairment. She walks wearing flip-flops without any signs of impairment.
>
> Impression:
> After reviewing the medical records provided as well as the videotape showing the claimant's observed level of functionality, it is my opinion that the claimant does not have level of impairment that precludes her from performing her own occupation of vice president/business development manager on a full-time basis, with or without restrictions. The videotape shows her to have no objective signs of impairment.

Dr. Hicks did not indicate how long he observed her performing these activities, whether he was ever informed of what Porter's job duties actually required, or what records he actually reviewed in his making assessment.

On November 16, 2007, Sun Life terminated Porter's claim, explaining its decision as follows:

> As you are aware, the claim process is an ongoing evaluation. Through routine claim adjudication and to ascertain whether your activities are consistent with your claimed impairment, we conducted multiple days of surveillance of your daily activities. During the course of surveillance we had the opportunity to

observe your activities on multiple consecutive days. You were observed driving to various establishments, including Wal-Mart, Apple Market, Office Depot, Casey's General Store and a gas station. You have the ability to enter and exit your Jeep Cherokee SUV without any difficulties, hesitations or body adjustments. You were observed walking without any apparent difficulty. You were observed going up steps while carrying shopping bags, stepping off curbs, walking down a small slope toward your neighbor's residence all without apparent difficulty. You were observed shopping, carrying several grocery bags in your left hand, and a beverage cup in your right hand, going up steps to unlock your front door and momentarily to close the screen door all without apparently difficulty. You were observed bending down in no apparent distress. Information received during our investigation indicates that you also trim your own hedges and have walked along a walking trail located at your complex that is only edged by a different cut in the grass. It was noted throughout the surveillance that you put your full body weight on your ankle and ambulated in a fluid unrestricted manner with no signs of discomfort.

On October 24, 2007, our medical consultant, Dr. Thomas Hicks, who is board certified in occupational medicine, reviewed your file along with the videotape of surveillance. Dr. Hicks' medical opined the following: "After reviewing the medical records provided as well as the videotape showing the claimant's observed level of functionality, it is my opinion that the claimant does not have a level of impairment that precludes her from performing her own occupation of vice president/business development manager in a full-time basis, with or without restrictions. The videotape shows her to have no objective signs of impairment."

Decision:
Based on the above information it appears that your functionality has increased to a level that would permit you to return to the duties of your own occupation. Despite your assertions to the contrary, you appear to be fully functional and the information within your claim file does not document a physical impairment which would prevent you from performing the duties of your own occupation as Vice President/Business Development Officer.

Based upon our review, there was insufficient clinical evidence that your medical condition continues to result in a functional impairment of such severity as to disable you from performing the duties of own occupation on a full time basis. It must be shown that one's medical condition results in an impairment of such severity that they are prevented from performing the duties

required by their regular occupation for any employer. Your reported symptoms and your documented level of functionality captured in the surveillance does not correlate to the level of clinical evidence to support your symptoms. […]

On February 26, 2008, Dr. Horton performed another evaluation of Porter's foot. Porter reported having pain in her "foot dorsal" and some tingling. She was taking Neurotonin, which was causing "mental cloudiness." She had also decreased her activities, which helped with the pain.

**D.      Plaintiff's appeal of the denial of her claim is denied.**

On May 14, 2008, Porter appealed the termination of her claim, submitting various documents in support.

Among the information she submitted was a Physician's Residual Functional Capacity ("RFC") completed by Dr. Kelly L. Ross on April 27, 2008. She found Porter could lift 10 pounds frequently and 25 pounds at one time. Dr. Ross also reported Porter could stand or walk for one hour at a time, for two hours total, and as she built up endurance that time would increase, up to four hours total in an eight hour workday, but Porter would need to elevate her feet for three hours during the workday. She stated that Porter's ability to perform basic activities (i.e. standing) would be further reduced by pain. She noted that the pain was present even when POrter was not exceeding her recommended limitations, and that the degree of pain experienced could be occasionally to frequently debilitating, depending on Porter's activity level.

A vocational report by Lesa A. Keen, VCE, rehabilitation consultant, was also submitted. Keen concluded that because of her restrictions, Porter "cannot return to her former position as a business development officer," and "competitive employment on a full-time basis will not be possible." It also noted that "her endurance will need to improve to allow her to pursue full-time competitive employment."

Porter also submitted various documents from her workplace detailing how much she traveled on a monthly basis, and how often she was expected to meet with residential and commercial real estate agents to generate business, and other information detailing her job tasks and distances she was required to travel to perform her regular job duties. She also submitted a statement detailing her personal daily activities, which included rest, some shopping, running errands, and occasionally picking up her nephew from school.

On September 17, 2008, nine months after Porter's benefits were terminated, Michelle Kelleher sent an internal memorandum to Rehabilitation Consultant Robert Violetta, in which she referenced the 2005 Concentra Labor Market Survey Report which concluded that all ten of the potential jobs it had identified exceeded her physical abilities. Ms. Kelleher notes that "It does not appear that a full [occupational] analysis was done." In a subsequent letter sent to Porter's counsel on November 26, 2008, Sun Life acknowledged that an "Occupational Review" showed Porter's regular occupation to be "a greater physical demand in the performance of the occupation than the sedentary finding that was previously reached in the review of Ms. Porter's claim."

On December 8, 2008, Dr. Richard D. Corzatt, a board certified orthopedic surgeon, summarized his findings after reviewing Porter's file. He answered a series of questions as follows:

> 1. Question: Have the claimant's complaints exacerbated from 1/1/097 to present?
>
> Answer: No. The claimant had reached MMI by 1/1/07. Her complaints of chronic right foot pain have remained the same. There is no medical evidence of symptoms exacerbation.
>
> 2. Question: Please comment on the claimant's ability to stand, walk, and drive a car.

Answer: Video surveillance in September 2007 documented the claimant has the ability for at least four hours a day to stand, walk, and drive a car intermittently with no evidence of pain behavior.

3. Question: Did the claimant have regular medical care from 1/1/07 to the present?

Answer: Yes. The claimant reached MMI one year post-op (October 2006). It is reasonable Dr. Horton evaluates her at six to 12-month intervals.

4. Question: Are the claimant's observed activities consistent with her reported restrictions and limitations?

Answer: No. The claimant was observed on two consecutive days for 3-4 hours a day driving, walking, and standing with no evidence of pain behavior. The claimant noted on Activity Questionnaire that she has constant pain in the ankle, is unable to walk without a limp, and must frequently elevate the lower extremity.

5. Question: Would appropriate orthotics and conditioning reduce the claimant's need to elevate her foot?

Answer: Yes. Dr. Horton noted in her last visit to him on 2/26/08 that she had little in the way of swelling. It appears that peripheral edema was no longer a significant problem.

6. Question: Please comment on any accommodations the claimant may require.

Answer: Both attending physicians, Dr. Horton and Dr. Ross, have commented the claimant avoid frequent to constant standing and walking. Predicated on the extensive reconstructive surgery and the available medical records, these restrictions and limitations appear to be reasonable.

On December 15, 2008, Sun Life referred the file for review by an occupational medicine specialist. The specialist, Lee Okurowski, M.D., M.P.H., provided a nine page report. Dr. Okurowski summarized Porter's medical records and responded to Sun Life's inquiries as follows:

1.  What restrictions and/or limitations are supported for the period from 01/02/07 to the present? If the R/L's have changed over this period, please specify the time frame for any such R/L's?

Since 01/02/07 the claimant has been at MMI.  The claimant is now almost 5 years status post injury with open reduction internal fixation of the original injury dating from 02/06/04.  In addition, the claimant is now over 3 years postop from right ankle surgery with partial synovectomy, right lateral ankle ligamentous reconstruction with a modified Brostroem procedure and second and third tarsal-metatarsal arthrodesis.  Previously, both Dr. Horton and Dr. Ross have recommended Sedentary capacity secondary to pain.  However, based on normal healing times and activities as demonstrated on video surveillance, these activities are no longer supported.  Video surveillance from September of 2007 demonstrates the claimant engaged in significant ambulatory activities on 2 consecutive days without evidence of significant functional impairment. The claimant is observed over a 3-4 hour time period walking, standing, driving, lifting, loading, and stepping without evidence of functional.  These activities are well in excess of what the claimant stated she could do.  As such, it is evident the claimant more likely than not has significant capabilities beyond SEDENTARY capacity.

2.  Are the observed activities consistent with the reported R/L's? Please explain.

No.  As stated above, video surveillance from September of 2007 demonstrates the claimant engaged in significant ambulatory activities on 2 consecutive days without evidence of significant functional impairment.  The claimant is observed over a 3-4 hour time period walking, standing, driving, lifting, loading, and stepping without evidence of functional impairment.  These activities are well in excess of what the claimant stated she could do in her Activity Questionnaire. As such, it is evident the claimant more likely than not has significant capabilities beyond SEDENTARY capacity.

Based on normative data and normal healing times, individuals with this type of injury and functional abilities are typically able to function beyond a SEDENTARY capacity.

3.  What accommodations and/or adaptive devices would facilitate the claimant's return to work?

Appropriate restrictions for an individual with this type of injury and functional abilities often include the following:

Standing not more than 50 min/hr, walking on a smooth surface up to 1200 feet/hr carrying up to 25 pounds; walking on an irregular surface up to 900 feet/hr carrying up to 25 pounds; climbing stairs up to 8 flights/hr carrying up to 25 pounds; limited ladder climbing. Limited activities requiring balance without handrail assistance limited applying strength against knee (pedaling, equating, kneeling, etc.).

Dr. Okurowski contacted Drs. Ross and Horton, but neither one was available and neither one returned Dr. Okurowski's phone call. On January 16, 2009, Dr. Okurowski provided an addendum to his report, indicating that he had attempted again to contact Drs. Ross and Horton and was unable to reach either one and did not receive any return calls. On January 23, 2009, Dr. Okurowski reported that he received a call back from Dr. Ross. He stated:

[…] I spoke with Dr. Ross at length regarding my findings on this case. We both agreed at this time, there was no clinical contraindications from the claimant performing Light Work at a minimum. We noted the claimant's subjective complaints of pain may represent some self-limiting behavior. Dr. Ross discussed the claimant's apparent requirement to wear designer "high heeled shoes." We both agreed the claimant would be better served with more functional foot wear. I made it clear to Dr. Ross that the designer high heeled foot wear was typically not a job requirement. Dr. Ross noted the claimant most likely could not stand or walk for unlimited durations. I agreed.

With this, the following restrictions and limitations would be considered appropriate:

Standing not more than 50 min/hr, walking on a smooth surface up to 1200 feet/hr carrying up to 25 pounds; walking on an irregular surface up to 900 feet/hr carrying up to 25 pounds; climbing stairs up to 8 flights/hr, carrying up to 25 pounds; limited ladder climbing. Limited activities requiring balance without handrail assistance, limited applying strength against knee (pedaling, squatting, kneeling, etc.).

On January 13, 2009, Porter submitted additional materials for review, including an updated treatment note from Dr. Horton, and her own affidavit detailing the demands of her former job. The treatment note stated,

> [Porter] tells me that she would go from office to office talking to clients. Her job was far from sedentary and basically required her to do substantial standing and walking. . . . For these reasons, I do not think that her physical functional capacity parallels her previous occupation, and she would be permanently disabled from doing her previous occupation.

Her affidavit stated that her work required her to be out of the office on sales calls for five to six hours per day, five days a week. These sales calls required her to travel up to two hours per day, and that while on these sales calls she was required to be on her feet, walking to, from, and around clients' offices. In total her job required her to be on her feet for one and a half to two hours at a time, for three to four hours a day, five days a week.

On February 3, 2009, Porter had another follow-up examination with Dr. Horton. He wrote, "she has several residual issues . . . [and] multiple areas of pain." His evaluation also notes anterior discomfort and chronic discomfort in the area over the fifth metatarsal. After noting that Porter's job with Los Padres was "not sedentary," he asserted that, "I do not think that her physical functional capacity parallels her previous occupation, and she would be permanently disabled from doing her previous occupation."

Porter also submitted a report from Dr. Kelly Ross, who noted that Porter "has never been pain free since her initial surgery," and concluded that she "is disabled from meeting all the requirements she previously performed." Dr. Ross also noted that Porter's previous position was not sedentary, and concluded that, "I feel that she is disabled from meeting all the requirements she previously performed."

Porter also submitted a Vocational Report from Keen Rehabilitation Services dated July 25, 2008, which discussed her work capabilities. Lesa Keen, Rehabilitation Consultant, reviewed the medical information in her file, and also conducted an in person in order to learn more about her functional capacity. Throughout the one and a half hour interview, Porter kept her affected foot elevated. She was also wearing special shoes with built in orthotics. Despite this, Keen noted swelling of the foot. Porter also reported that she had been trying to increase her endurance, but that if she is on feet for more than three to four hours over a 12-16 hour day, she had to take a day off to recover and return her pain to a more manageable level. Keen concluded that,

> [Porter] cannot return to her former position as a business development officer as the position requires a great deal of standing, walking, and foot pedal usage to drive her car to various locations. Furthermore, she is still required to elevate her leg to decrease pain on a daily basis for at least three hours out of an eight-hour day work-day. This is based on Dr. Kelly L. Ross' Residual Functional Capacity assessment dated April 27, 2008. Until this restriction is greatly lessened (during break periods only), competitive employment on a fulltime bases will not be possible.

On March 19, 2009, Sun Life referred the file to its rehabilitation unit to clarify certain requirements and reasonable accommodations for Porter's occupation given that Plaintiff's physicians had opined that she was unable to perform her regular occupation due to "frequent constant pedal operation" and lack of inability to wear dress shoes. Vocational counselor Sandra Boyd, MS, CRC, CDMS answered the following questions:

> 1. How much driving is typically required for this occupation?
>
> 2. Are there any reasonable accommodations regarding driving and/or pedal operation?

3. Does the occupation require any specific footwear?

Boyd opined that reasonable accommodations can be made to a motor vehicle that would accommodate Porter's restriction of pedal operation due to her right foot operations, and that Porter would be able to purchase orthopedic dress shoes which would meet her employer's dress code.

During its review of Porter's appeal, Sun Life also realized that Porter's employer, Los Padres Mortgage Company, LLC, was not listed as a subsidiary to be covered under the Certificate on the request for coverage form Los Padres Bank submitted in 2001.

On April 6, 2009, Sun Life upheld is previous termination of benefits. In a twelve page letter explaining its denial, Sun Life stated that Los Padres Mortgage Company was not a covered subsidiary relative to the coverage issued to Los Padres Bank, which likely negating her eligibility for coverage. Sun Life also explained that Porter did not have any treatment for her condition from October 26, 2006 until February 26, 2008, which falls outside the applicable 6 to 12 months interval. Finally, Sun Life reasoned that the identified restrictions of difficulty constantly operating pedals and wearing dress shoes could reasonably be accommodated by adaptive equipment and orthopedic dress shoes, thus she could return to her former employment.

On May 6, 2009, Porter filed this lawsuit.

**Discussion**

Porter contends that Sun Life's termination of her benefits is not supported by substantial evidence. She argues that Sun Life improperly rejected credible evidence supporting the award of benefits, mischaracterized her job as sedentary, continually changed its reasons of denial, ignored the opinions of her treating physicians, misstated and exaggerated the significance of surveillance footage, and ignored the recommendation of its own reviewed that she participate in

an in-person medical review. Sun Life responds that it is entitled to summary judgment because Porter was not eligible for coverage under the Certificate, and even if she were eligible, its determination that she was no longer entitled to benefits is supported by substantial evidence. Finding that Porter is not covered by the Certificate, and that this issue is dispositive, the Court will not address whether the termination of benefits was otherwise supported by the record.

**I.     Sun Life's termination of Porter's claim is supported by substantial evidence, because she is not an employee of Los Padres Bank and therefore not eligible for coverage under the Certificate.**

Sun Life argues that Porter is not covered by the Certificate because her employer, Los Padres Mortgage Company, LLC, ("LPMC") is a separate entity from Los Padres Bank, the holder of the Certificate underlying Porter's claim. Sun Life contends that only active employees of the three entities listed on the Request for Coverage, namely Los Padres Bank, and subsidiaries Harrington Bank and Harrington Wealth Management, are entitled to benefits under the Certificate.

Porter contends that Sun Life cannot deny coverage because (1) it was aware that LPMC was a subsidiary of Los Padres Bank when it was paying her benefits back in 2004, and did not raise the issue until after terminating her benefits for other reasons; (2) the Request for Coverage form is irrelevant and provides no support for the allegation that LPMC employees are not covered by the Certificate; and (3) even if LPMC is not a covered subsidiary, the principal of equitable estoppel prevents Sun Life from claiming she is not covered under the policy.

**A.     There is substantial evidence in the record that LPMC employees were not covered by the Certificate.**

As an initial matter the Court finds that the Request for Coverage form is relevant and provides substantial evidence for Sun Life's argument that Porter and other LPMC employees are not covered by the Certificate. The fact that Sun Life specifically requested information on its Request for Coverage form concerning which subsidiaries would be covered by the Certificate confirms the obvious, that an insurance company such as Sun Life would like to know whose employees it was agreeing to cover. The fact that Los Padres Bank identified two subsidiaries that it did want covered confirms the common-sense understanding that this information was relevant and important for determining coverage. Consequently, the fact that LPMC has never been listed as a covered subsidiary evidences that Porter was not covered by the Certificate.

**B.** **The fact that Sun Life became aware that Porter was employed by an uncovered subsidiary while paying her benefits did not obligate it to keep paying her benefits.**

Porter argues the Court should disregard the coverage argument because Sun Life was made aware that Porter worked for LPMC in October 2004, shortly after it began paying her benefits, and continued to pay her benefits for another three years.

There is no merit to this argument. First, the information given to Sun Life about Porter's employment status was not as clear-cut as Porter suggests. Although Porter is correct that Sun Life was notified in October 2004 that Porter was employed by LPMC, this notification was sent by a Los Padres Bank human resource supervisor on bank letterhead, which indicates the bank and LPMC had some sort of close corporate relationship. While this arguably should have been enough to alert Sun Life that perhaps there was a coverage issue here, nothing about the letter unambiguously indicates a coverage problem. The letter does not, for example, explain that

LPMC is a separate entity that was not listed on the Request for Coverage form. It was not until May of 2008 that Sun Life received information that unambiguously described the relationship between the bank and LPMC. Second, even if Sun Life had been unambiguously told that Porter was not covered by the Certificate, absent some legal doctrine such as estoppel, the fact that Sun Life mistakenly paid a claim that it did not have to pay for several years before discovering the mistake, does not obligate it to keep making this mistake.

### C.     Sun Life is not estopped from denying Porter's eligibility for benefits.

Porter contends that even if LPCM was not a covered subsidiary, equitable estoppel prevents Sun Life from now denying coverage. She argues that there is an ambiguity regarding which employees are covered under the Certificate, and where there is an ambiguity equitable estoppel prevents a plan administrator from subsequently denying its interpretation of ambiguous plan terms. Porter suggest that Sun Life interpreted the Certificate as providing coverage to Porter, an interpretation which Sun Life communicated to Porter by paying her benefits for more than three years, thus Sun Life is now estopped from denying this interpretation of coverage.

This argument is not persuasive. The Eighth Circuit has held that "[c]ourts may apply the doctrine of estoppel in ERISA cases only to interpret ambiguous plan terms," *Fink v. Union Cent. Life Ins. Co.*, 94 F.3d 489, 492 (8th Cir. 1996), but there is no ambiguity here concerning whether LPCM is covered by the Certificate. It is not. Sun Life's failure to note the lack of coverage in its initial determination was an error, not an interpretation of an ambiguous provision. Furthermore, "common-law estoppel principles cannot be used to obtain ERISA benefits that are not payable under the terms of the ERISA plan." *Id*.

Even if there were not controlling caselaw on point foreclosing this argument, Porter cannot establish a prima facie case of equitable estoppel. The elements of equitable estoppel, as defined by federal common law, are:

> (1) the party to be estopped misrepresented material facts; (2) the party to be estopped was aware of the true facts: (3) the party to be estopped intended that the misrepresentation be acted on or had reason to believe the party asserting the estoppel would rely on it; (4) the party asserting the estoppel did not know, nor should it have known, the true facts; and (5) the party asserting the estoppel reasonably and detrimentally relied on the misrepresentation.

*National Companies Health Benefit Plan v. St. Joseph's Hosp.*, 929 F.2d 1558, 1572 (11th Cir. 1991). But Porter cannot show that Sun Life misrepresented material facts. At most, Sun Life should have caught the coverage error sooner, which is not the same thing as misrepresenting a material fact. Nor can Porter show Sun Life was aware of the true facts. While it arguably should have been aware of the true facts, there is no evidence here indicating is was actually aware of the true facts. Most importantly, Porter cannot demonstrate the fifth element, that she relied on the misrepresentation to her detriment. If she received three years of benefits she was not entitled to, then she has benefited from, not been damaged by, any misrepresentation here. Consequently, she has no claim for equitable estoppel.

### Conclusion

Finding that Porter is not covered by the Certificate, Sun Life's motion for summary judgment (doc. 54) is GRANTED and Porter's motion (doc. 56) is DENIED.

**IT IS SO ORDERED.**

Date:   April 20, 2011                             /s/ Greg Kays
                                                   GREG KAYS, JUDGE
                                                   UNITED STATES DISTRICT COURT